IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ANTHONY HARO                                                                                    PLAINTIFF

V.                                    CASE NO. 5:25-CV-5105

DR. THEODORE T. BROWN;
RAY SHASTID; and
DANIEL ESTERLINE                                                                               DEFENDANTS

### AMENDED MEMORANDUM OPINION AND ORDER

Before the Court are Separate Defendant Dr. Theodore Brown's Motion to Dismiss (Doc. 16) and Brief in Support (Doc. 17) and Plaintiff Anthony Haro's Response in Opposition (Doc. 18).  The Court finds that Mr. Haro's claims against Dr. Brown fail to state a claim upon which relief can be granted because Dr. Brown is entitled to qualified immunity. The Motion is therefore **GRANTED** and Mr. Haro's claims against Dr. Brown are **DISMISSED WITH PREJUDICE**..[1]

### I.     BACKGROUND

Mr. Haro brings this action under 42 U.S.C. § 1983.  He claims that Bentonville, Arkansas police officer Daniel Esterline, Chief of Police Ray Shastid, as well as the Director of the Arkansas State Crime Lab, Dr. Theodore T. Brown, violated his Fourth Amendment right to be free from unreasonable searches and seizures.  Although Mr. Haro seems to concede he voluntarily provided a urine sample following his arrest for driving while intoxicated, he contends Defendants later tested that sample after he had withdrawn his consent.

---

[1] This Amended Order clarifies that Mr. Haro's claims are dismissed with prejudice; the substance of the Court's pervious order (Doc. 21) is unchanged.

1

The sequence of events is straightforward.  On October 19, 2024, officers stopped Mr. Haro, arrested him, and collected his urine.  Six days later, on October 25, Mr. Haro sent certified letters to Officer Esterline, Chief Shastid, and Dr. Brown that purported to revoke Mr. Haro's "actual or implied" consent to his giving of the urine sample, and that stated Mr. Haro did not "authorize anyone to test the urine sample for any reason."  *See* Doc. 18-1.

After receiving Mr. Haro's letter, Dr. Brown first sought guidance from lawyers for the Department of Public Safety on whether the sample could be tested.  *See* Doc. 18-2.  With their paragraph of advice in hand on why testing was permissible under Arkansas law, Dr. Brown directed a toxicologist at the State Crime Lab to test the urine sample on or about December 16, 2024.  (Doc. 2 ¶ 18).  Dr.  Brown—sued here in his individual capacity—now moves to have the counts against him dismissed, arguing that he is entitled to both qualified and statutory immunity.

## II.     LEGAL STANDARD

The doctrine of qualified immunity "shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known."  *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009). To prevail on qualified immunity at the motion to dismiss stage, a defendant must show that they are "entitled to qualified immunity on the face of the complaint."  *Bradford v. Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005).  This involves a two-step inquiry in which the court considers: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right; and (2) whether

that right was clearly established at the time of the defendant's alleged misconduct." *Brown*, 574 F.3d at 491.

For a right to be one that is clearly established, it must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). There need not be a "case directly on point" to prove a violation, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. at 12. Further, the "right" must be established in the "specific context of the case, not as a broad general proposition," so that it is clear that the "violative nature of *particular* conduct is clearly established." *Id*. (emphasis in original). A plaintiff may make this required showing in three ways: (1) by pointing to "existing circuit precedent that involves sufficiently similar facts;" (2) presenting a "robust consensus of cases of persuasive authority doing the same;" or (3) by demonstrating that there is a general constitutional rule that applied with "obvious clarity to the facts at issue." *See Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020) (citation modified).

### III. DISCUSSION

#### A. Violation of a Constitutional Right

The Fourth Amendment secures the "right of the people to be secure in their persons . . . against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause." Warrantless searches are presumptively unreasonable unless the search falls "within a recognized exception." *Missouri v. Mcneely*, 569 U.S. 141, 148 (2013). Consent is one such exception. *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991). But even where a suspect initially consents to a search, consent may be limited or withdrawn so long as the individual does so through an

"unequivocal act or statement."  *United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005); *see also Riggs v. Gibbs*, 923 F.3d 518, 523 (8th Cir. 2019).

Before tackling the Fourth Amendment analysis here, though, the Court must first consider whether the testing of Mr. Haro's urine was a "search" within the meaning of the Fourth Amendment.  The Court concludes that it was—collecting a person's urine is a search because it intrudes on personal security and bodily integrity, and testing that sample is a search because it invades a separate privacy interest in the biological information that the sample contains.  In *Skinner*, the Supreme Court considered whether regulations promulgated by the Federal Railroad Administration, which required blood and urine tests of certain employees after major train accidents and safety rule violations, ran afoul of the Fourth Amendment.  *Skinner v. Ry. Lab. Execs.'* Ass'n, 489 U.S. 602 (1989).  Although the Court ultimately held that the searches were justified by the so-called "special needs" exception to the Fourth Amendment, it first considered the privacy interests in collecting and testing urine.  *Id.* at 633.  In doing so, the Court suggested that the collection and testing of urine were distinct searches, rather than a continuous search, and explained the distinct privacy interests at issue in the testing of urine:

> "It is not disputed, however, that chemical analysis of urine, like that of blood, can reveal a host of private medical facts about an employee, including whether he or she is epileptic, pregnant or diabetic.  Nor can it be disputed that the process of collecting the sample to be tested . . . itself implicates privacy interests . . . . Because it is clear that the *collection* and *testing* of urine intrudes upon expectations of privacy that society has long recognized as reasonable . . . these *intrusions* must be deemed *searches* under the Fourth Amendment."

*Id*. at 617 (emphasis added).

Justice Marshall's dissent spoke more clearly on the issue (and in the Court's reading, did not depart from the majority), noting that the "chemical analysis" of urine

4

samples "implicates strong privacy interests apart from those intruded upon by the collection of bodily fluids" and that such analysis can "provide Government officials with a periscope through which they can peer into an individual's behavior in her private life, even in her own home." *Id*. at 647 (Marshall, J., dissenting). The Supreme Court then appeared to hold to this reasoning in *Ferguson*, where the Court held that the nonconsensual testing of maternity patients' urine for drugs and the reporting of the results to local police for law enforcement purposes was unreasonable and did not fall within the "special needs" exception. *Ferguson v. City of Charleston*, 532 U.S. 67, 84–85 (2001). Citing *Skinner*, the Court similarly found that the "urine tests conducted by" the staff members in *Ferguson* were "indisputably searches within the meaning of the Fourth Amendment." *Id*. at 77.

So, although the Supreme Court has apparently not had occasion to explicitly hold that the collection and then testing of urine are distinct searches for purposes of the Fourth Amendment, the Court finds that a close reading of *Skinner* and *Ferguson* suggest that they are. For purposes of determining whether a constitutional violation occurred here, then, the Court considers the collection by officers and then testing by Dr. Brown to be separate Fourth Amendment events.

That brings us to the facts here. Officers lawfully collected Mr. Haro's urine with his (apparently) voluntary consent. Roughly a week later, however, Mr. Haro clearly and unequivocally withdrew any permission to test his urine sample. (Doc. 18-1). No reasonable official could read Mr. Haro's letter as anything but him withdrawing his consent. Still, no warrant was sought by the State. No exigency was claimed or other

5

exception invoked (and for that matter, nor was one briefed here).  But a month after Mr. Haro withdrew his consent, the State tested his urine sample anyway.

Under these circumstances, the Fourth Amendment does not allow for Dr. Brown's actions.  Testing the urine was not a simple oversight or a simple mistake.  Dr. Brown consulted with legal counsel, who advised him only on Arkansas law, let Mr. Haro's urine collect dust for a month, and then undertook a fresh search which required fresh legal authorization.  Absent a warrant or other exception, law enforcement relied on consent, which, as already stated, may be withdrawn by a suspect after it is given.  Because the State and Dr. Brown's only justification for the second search was Mr. Haro's consent—and because that consent was unmistakably revoked before the test occurred—the search occurred without any lawful authority, and was therefore unconstitutional.

### B.  Was The Right Clearly Established

But while the Court finds that Mr. Haro has alleged a constitutional violation, Dr. Brown remains entitled to qualified immunity because that violation was not clearly established as of December 16, 2024.  Mr. Haro does not point the Court to any authority—binding or persuasive—explicitly holding that Dr. Brown's testing of Mr. Haro's urine sample is a standalone search within the meaning of the Fourth Amendment.  Instead, he argues that there is a general constitutional principle that allows a person to limit the scope of the search to which they consent, and that as a consequence Dr. Brown ought to have honored Mr. Haro's post-collection withdrawal of his consent.

While the Court agrees with Mr. Haro that, as a matter of first impression, Dr. Brown should have considered Mr. Haro's revocation of consent and not tested his urine, the Court does not agree that the constitutional principles applied with obvious clarity to

the facts at hand here, or that existing precedent has placed the violation beyond constitutional debate.  Here, in proving his case, Mr. Haro would confront legal ambiguity at each stage.  For example, and as discussed above, for Mr. Haro to eventually prevail on his Fourth Amendment claim, the Court would need to determine whether the collection and subsequent testing of Mr. Haro's urine are distinct searches for Fourth Amendment purposes.  And while *Skinner* and *Ferguson*, read together, suggest as much, the Court is not convinced that the cases place the issue beyond debate.

A plaintiff must do more than state a plausible case that a constitutional violation occurred in order to overcome qualified immunity.  Based on the parties' briefing and the Court's own analysis, no court has yet considered whether consent given by a criminal suspect for biological testing at the collection stage may be withdrawn before the testing stage.  Nor has a court considered whether the state's testing of a suspect's urine without a warrant or the suspect's consent would be reasonable, the "touchstone of Fourth Amendment analysis."  *Birchfield v. North Dakota*, 579 U.S. 438, 477 (2016).  Even in defining the scope of the alleged constitutional violation here, both Mr. Haro and the Court would be swimming in murky waters.

So although *Skinner* and *Ferguson* are suggestive, the Court is unconvinced that they put Dr. Brown on notice that his testing of Mr. Haro's urine would violate Mr. Haro's constitutional rights.  A plausible, or even convincing, argument cannot render a constitutional principle beyond debate where precedent has not.  Absent more, the Court declines to impose on Dr. Brown the costs that qualified immunity was meant to prevent— the distraction of an official from their duties, inhibition of their work, and deterring other able citizens from serving in public office—for what might have been a "reasonable but

7

mistaken judgment[ ] about [an] open legal question[ ]." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

## IV.     CONCLUSION

Because Dr. Brown is entitled to qualified immunity from suit, **IT IS ORDERED** that Dr. Brown's Motion to Dismiss (Doc. 16) is **GRANTED** and Mr. Haro's claims against him are **DISMISSED WITH PREJUDICE**.  Mr. Haro's claims against Defendants Shastid and Esterline remain live for adjudication.

**IT IS SO ORDERED** on this 18th day of December, 2025.


*/s/ Timothy L. Brooks*
TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE